1

1           UNITED STATES DISTRICT COURT

2             DISTRICT OF OREGON

3

4     THE HON. ANN L. AIKEN, JUDGE PRESIDING

5

6

7  UNITED STATES OF AMERICA,      )
                              )

8               Government,   )
                              )

9       v.                ) No. 06-60080-AA
                              )

10  SUZANNE SAVOIE,          )
                              )

11              Defendant.   )
   _____)

12

13

14     REPORTER'S TRANSCRIPT OF PROCEEDINGS

15             EUGENE, OREGON

16

17       THURSDAY, MAY 31, 2007

18         PAGES 1 - 69

19

20

21           Kristi L. Anderson
             Official Federal Reporter

22           United States Courthouse
             405 East Eighth Avenue

23           Eugene, Oregon 97401
             (541) 431-4112

24           Kristi_Anderson@ord.uscourts.gov

25

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE GOVERNMENT:   UNITED STATES ATTORNEY
                          BY:   JOHN RAY, ESQ.
 4                        john.ray@usdoj.gov
                          and  KIRK ENGDALL, ESQ.
 5                        kirk.engdall@usdoj.gov
                          405 East Eighth Avenue
 6                        Eugene, Oregon 97401
                          (541)465-6771
 7

 8   FOR THE GOVERNMENT:   UNITED STATES ATTORNEY
                          BY:   STEPHEN PEIFER, ESQ.
 9                        1000 SW Third Avenue, Suite 600
                          Portland, Oregon 97204-2902
10                        (503)727-1044
                          steve.peifer@usdoj.gov
11
     FOR THE DEFENDANT:    JOHN J. KOLEGO
12                        BY:   JOHN J. KOLEGO, ESQ.
                          804 Pearl Street
13                        Eugene, Oregon 97401
                          (541)484-1066
14                        johnkolego@yahoo.com

15

16

17

18

19

20

21

22

23

24

25
```

| 1 | PROCEEDINGS |
| 2 | THURSDAY, MAY 31, 2007 |
| 3 | THE COURT: Good morning. Please be seated. |
| 4 | THE CLERK: This is the time set for Criminal |
| 5 | 06-60080, United States of America versus Suzanne Savoie, |
| 6 | imposition of sentence. |
| 7 | THE COURT: Good morning. |
| 8 | MR. RAY: Good morning, Your Honor. The |
| 9 | government's presentation will be brief. We have one |
| 10 | witness and a brief statement after that. |
| 11 | THE COURT: All right. |
| 12 | MR. RAY: We'll call Steve Swanson to the stand. |
| 13 | THE CLERK: Sir, can I just have you step forward |
| 14 | over here and raise your right hand. |
| 15 | *(The witness was sworn.)* |
| 16 | THE CLERK: Please be seated, and state your name, |
| 17 | spelling your last name. |
| 18 | THE WITNESS: I'm Steven D. Swanson, |
| 19 | S-W-A-N-S-O-N. |
| 20 | **DIRECT EXAMINATION** |
| 21 | BY MR. RAY: |
| 22 | Q.  Mr. Swanson, what is your occupation? |
| 23 | A.  I'm the president of Swanson Group. |
| 24 | Q.  And what is the Swanson Group? |
| 25 | A.  Swanson Group is the parent company, which is the |

1     parent to a number of smaller forest products companies.

2     Q.    I'm sorry.  Smaller what?

3     A.    Forest products companies, actually consisting of

4     sawmills, veneer and plywood operations, helicopter

5     operations, and wholesale distribution.

6     Q.    And is one of those subsidiaries Superior Lumber

7     Company?

8     A.    Yes, it is.

9     Q.    Tell us a little bit about the nature of the business.

10    I know you have already mentioned it's forest products, but

11    can you elaborate on that a bit?

12    A.    We process raw logs into softwood lumber, into veneer,

13    which then becomes plywood.  We also have a helicopter

14    services company that provides logging services for

15    ourselves and for others, as well as firefighting and some

16    light construction.  In addition to that, we have a

17    wholesale distribution company where we sell some of our own

18    forest products.

19                        (Reporter interrupted.)

20              THE COURT:  You really need to slow down because

21    it's hard to hear generally in this courtroom, but for the

22    court reporter, it's almost impossible to take you down.

23              THE WITNESS:  Okay.  We have a wholesale

24    distribution company that sells our own products we produce,

25    as well as others.

1    BY MR. RAY:

2    Q.   Okay. How long have you worked there?

3    A.   For 30 years. I joined the company in 1977 after

4    attending the University of Oregon and studying accounting.

5    Q.   Okay. And so how did you start out?

6    A.   I started out as the office manager in charge of all

7    the accounting and essentially almost a one-man shop.

8    Q.   Okay. And thereafter?

9    A.   In 1989, I became general manager of Superior Lumber

10    Company, and from there we grew the company. I became

11    president of Superior Lumber in -- and Swanson Group, excuse

12    me, in 2001.

13    Q.   When did Superior Lumber merge into the Swanson Group?

14    A.   At the end of 2001.

15           MR. RAY: Okay. All right. At this time I would

16    offer into evidence what has been marked -- previously

17    marked as Government's Exhibits 1 through 14, and would ask

18    permission to play the electronic version.

19           MR. KOLEGO: We have no objection, Your Honor.

20           THE COURT: Thank you.

21    BY MR. RAY:

22    Q.   Mr. Swanson, at one point, the headquarters of Superior

23    Lumber Company was destroyed by fire --

24    A.   That's --

25    Q.   -- is that correct?

1   A.   That's correct.

2   Q.   Referring you to what has been marked as Government

3   Exhibit 1, was that the date of the fire?

4   A.   Yes, it was.

5   Q.   Where were you at the time?

6   A.   I was actually in San Diego visiting family at the end

7   of a Christmas vacation, and I actually heard about the fire

8   while I was in the airport heading home.

9   Q.   Okay.  Who called you and told you about the fire?

10  A.   My mother called.  It was very early in the morning,

11  about 6:30, and she called and said there had been a fire in

12  the office that started in the kitchen area.  And my first

13  thought was that over a long weekend we maybe left the

14  coffee pot on and we had a fire.  I wasn't overly concerned

15  at that point.

16       Within a half an hour, before I boarded the plane,

17  I had gotten a call from Chuck Wert, who was the vice

18  president of Superior Lumber, and it was pretty clear to

19  him, having been on the scene, that it was a much more

20  extensive fire.  It actually started in a couple places, and

21  the damage was pretty severe.

22  Q.   What did you do in response to that?

23  A.   Well, I continued my trip home, flew through Portland

24  to Medford, and then drove to Glendale to see for myself

25  what had happened.  Got there in the late afternoon, and the

1     building was still -- still smoldering, power was off, still

2     firefighters around, and a whole bunch of investigators from

3     local police agencies and state police, and I think some

4     federal investigators as well.

5            I went in, toured around the building just to kind

6     of see what kind of damage we had.  We actually had to --

7     we'd walk inside and see up through the roof, and it was

8     pretty devastating.

9  Q.   Recognizing that you are not a fire expert, were you

10    able to observe what you believed to be the points of origin

11    of the fire?

12 A.   Yes.  It was real obvious that there were two points of

13    origin, one near the kitchen and one where a window of the

14    office had come out the corner of the building.

15 Q.   Okay.  Referring you to the screen, now, beside you,

16    what has been marked as Government Exhibit 2, what is that?

17 A.   That is a picture of the offices of Superior Lumber

18    Company in Glendale, Oregon.

19 Q.   And now Government Exhibit 3, what is that?

20 A.   That is a diagram of that same office.

21 Q.   Okay.  Now, in Government Exhibit 3, there is a red

22    portion to the left.  Is that the front of what appears in

23    Government Exhibit 2, the office of Superior Lumber?

24 A.   Yes, that's the very front of the office.

25 Q.   Okay.  And what is Government Exhibit 4?

1   A.   That is a point of origin of the fire.  It would be on

2   the east side of the building where the -- the wing comes

3   out, forms a corner there.

4   Q.   Okay.  What is Government Exhibit 5?

5   A.   That's the same picture, but alongside would be a

6   diagram of the office itself.

7   Q.   What is the red portion that's shown on the diagram

8   that's on the left side?

9   A.   The red portion is the point of origin for -- one of

10   the points of origin for the fire.

11   Q.   So in other words, the red portion is showing the

12   location of the photograph?

13   A.   Yes.  The red portion is the point that shows in the

14   corner of the picture.

15   Q.   Okay.  And what is Government Exhibit 6?

16   A.   That's the second point of origin of the fire.  It's on

17   the west side of the building.  It's actually outside of the

18   kitchen/break room of Superior Lumber Company.

19   Q.   And now Government Exhibit 7.  What's that?

20   A.   That's the same picture with the diagram of the office

21   alongside.

22   Q.   And the red portion on the diagram?

23   A.   The red portion on the diagram depicts the point of

24   origin as indicated in the picture to the right.

25   Q.   Okay.  What is Government Exhibit 8?

1   A.   That is a picture of the inside of the sales office.

2   As you look toward the back of the room, you can see a desk

3   that was actually occupied by my cousin, Christy McDowell.

4   It's a desk made especially for her.  She has been in a

5   wheelchair for -- since she was 19 years old, and you can

6   see that the shelves are lower so she could reach them from

7   a wheelchair.

8   Q.   All right.  Then -- and Government Exhibit 9?

9   A.   That's the same picture with a diagram of the office

10   alongside.

11   Q.   Okay.  And the red portion depicts the location of the

12   office?

13   A.   Yes, it does.

14   Q.   Directly adjacent to the main computer room?

15   A.   That's correct.

16   Q.   Okay.  What is Government Exhibit 10?

17   A.   That is an inside picture of the kitchen/break room.

18   You can see in the lower left-hand corner the dishwasher is

19   actually open there.

20   Q.   And 11?

21   A.   11 is the same picture with the diagram of the office

22   alongside.

23   Q.   Okay.  And again, the red portion depicts the location

24   of the photograph?

25   A.   That's correct.

1   Q.   Now, sometime after the fire, were you provided a copy

2   of a communique from someone?

3   A.   Yes.   I believe we were notified by one of the either

4   print media or television media that there was a communique.

5   Q.   Okay.   Is Government Exhibit 12 that communique?

6   A.   Yes, it is.

7   Q.   All right.   Was the building totally destroyed by the

8   fire?

9   A.   No.   It was a relatively new construction that had some

10  firewalls in the attic space that prevented the fire from

11  consuming the entire building, as well as the fact that the

12  local fire department, even though an all volunteer fire

13  department, responded quickly and was able to contain the

14  fire to the areas that were shown in the previous pictures.

15  Q.   Okay.   What was the amount of the financial loss as a

16  result of the fire?

17  A.   Just over $949,000.

18  Q.   Okay.   How much of that was covered by insurance?

19  A.   All but a 5,000-dollar deductible.

20  Q.   Okay.   And what was the name of the insurance company

21  that paid most of the loss?

22  A.   That was -- the name is the ACE Insurance Company.

23  A-C-E.

24  Q.   Okay.   Now, when you first learned about the fire when

25  you were in the airport in California, was it a total

1   surprise to you?

2   A.   It was a total shock. You know, we are a small,

3   family-owned company operating in a rural community,

4   Glendale, Oregon. It's just a total shock. We had never

5   had anything of that nature happen before.

6   Q.   You had never had any previous threats directed at the

7   company?

8   A.   No previous threats, although we were harvesting timber

9   in the Applegate Valley, and there was a lot of uproar over

10   that activity.

11   Q.   Okay. If you recall, what was the percentage of

12   government timber that was being harvested by Superior

13   Lumber at that time?

14   A.   I can't recall the exact number, but I do know that we

15   were the largest purchaser and harvester of BLM timber in

16   the year 2000.

17   Q.   Okay. Now, Mr. Swanson, you told us about the

18   financial impact of the fire on the company. Describe for

19   us the impact of the fire on the company beyond the

20   financial impact -- effect.

21   A.   Well, it had a profound impact on our employees,

22   particularly the administrative staff and managers that

23   resided in that office. It was a real shock to come to the

24   building and see it as burned out and realize that you were

25   the target of an arson fire. Some of the people that worked

1    there had to work out of their homes, literally sitting in
2    their cars, making phone calls. We had to double and triple
3    office spaces, put two to three people in an office space in
4    order to provide for them. We moved them into an old rental
5    house converted to a sales office. People really literally
6    worked around the clock in the first days following that
7    fire.

8         Our biggest concern was that we wouldn't be able
9    to make our payroll for our employees or for our loggers and
10   suppliers. In our industry, we typically pay on the 10th
11   and the 25th of each month. This fire happened on the 2nd.
12   We had just a very few days to regroup and get out a
13   payroll. And it was truly important. These are working
14   class people in these operations. There are logging
15   companies that work for us. They employ working class
16   people. They need these paychecks, and there was some
17   genuine concern that we wouldn't get that out in time, but
18   we were successful in getting that done.

19   Q.   Tell us about that.

20   A.   Well, that's actually one of my proudest moments.  Our
21   employees simply wouldn't let this put us down, wouldn't let
22   this stop us. They worked really, really hard and
23   diligently, and then managed to get that payroll out, and we
24   were actually selling lumber that very day out of, like I
25   said earlier, on cell phones out of salesmen's cars, and I'm

1    just extremely proud of the fact that we were able to
2    persevere and continue on.
3    Q.   And what was the response of the community of Glendale?
4    A.   We had tremendous support from our community.  You
5    know, I was born and raised there.  I went to high school
6    there.  Graduated from Glendale High School.  Raised a
7    family there.  My son graduated from high school there, and
8    we are truly part of the community.  And those people
9    responded by offering any kind of help that they possibly
10   could, and we knew they stood behind us.
11   Q.   Okay.  What was the effect of the fire on you
12   personally and on your family?
13   A.   It was quite devastating.  My wife was severely
14   traumatized.  She came from a more urban background, and
15   this kind of thing just never happened before.  And it
16   was -- it was quite shocking.  We actually hired a couple of
17   different security specialists to come in and give us some
18   advice on what we could do to protect ourselves.  We had to
19   put a security system in our home.  You literally felt
20   invaded.  For weeks and months and well into years later,
21   every time you went out to get in your car, if it was parked
22   outside overnight, you'd wonder, literally walk around and
23   look for devices that might be under your tires and
24   wondering whether or not there was going to be some further
25   attack.  We had to make just a lot of changes in our life as

1  to how we lived. All of a sudden we realized that we could
2  be the target of a violent attack.
3  Q.  Was Superior Lumber Company rebuilt after that?
4  A.  The office was rebuilt.
5  Q.  Yeah. And --
6  A.  Nine months later.
7  Q.  I'm sorry?
8  A.  Nine months later.
9        MR. RAY: I don't have any other questions.
10        MR. KOLEGO: I don't have any questions of this
11  witness.
12        THE COURT: Thank you.
13        May this witness be excused?
14        MR. RAY: Yes, Your Honor. Thank you.
15        THE COURT: Thank you. Free to go.
16        MR. RAY: At this time, Your Honor, I'd ask you to
17  take judicial notice of the government's presentation with
18  respect to the Jefferson Poplar Farm arson that was
19  presented during Mr. Meyerhoff's sentencing.
20        THE COURT: Any objection?
21        MR. KOLEGO: No objection, Your Honor.
22        THE COURT: Noted.
23        MR. RAY: I just have one brief statement, if I
24  may, Your Honor.
25        THE COURT: Um-hmm.

1    MR. RAY:  Suzanne Savoie began her role as an
2    activist during her college years and started attempting to
3    halt fox hunts while she was in the United Kingdom, and then
4    escalating to multiple antigenetic engineering crimes.  She
5    was a participant in the World Trade Organization protest in
6    Seattle in 1999, which, as the court will recall, placed
7    Eugene on a national map as a hotbed of activism.

8          She was a participant in all five of the book club
9    meetings, which took place over a year and a half period.
10   Her first involvement in an arson was at the Superior Lumber
11   Company, which we just heard about, in Glendale on
12   January 2nd of 2001, along with Ferguson, Tubbs, Meyerhoff,
13   and McGowan, who was at that time her boyfriend.  Her role
14   was as a lookout and in assisting McGowan afterwards in
15   preparing the communique.

16         About a little over four months later, she and
17   McGowan, Meyerhoff, Zacher, and Block set fire to the
18   Jefferson Poplar Farm in Clatskanie.  That was on
19   May 21st of 2001.  Her role there was as both a driver and a
20   lookout.  And she, along with McGowan, had also done some
21   research on the business beforehand.

22         The court will recall from the government's
23   presentation during the Meyerhoff sentencing that the fire
24   caused -- or destroyed two buildings, totaled 18 vehicles
25   and a trailer at a cost of almost a million dollars.

1    Afterwards, a communique was prepared.  The --
2    which the court's familiar with.  The key language is
3    highlighted on Government Exhibit 13.

4         We would ask the court to find, consistent with
5    your previous rulings, that the terrorism enhancement
6    applies with respect to the Jefferson Poplar Farm arson.

7         However, the government would move for a two-level
8    downward adjustment for minor role in Ms. Savoie's case.

9         We also will move for a downward departure for
10   substantial assistance based upon Ms. Savoie's cooperation
11   with the government, as was outlined in our letter to you of
12   May 21st.  She was particularly helpful to the government
13   with respect to the book club meetings, which are an
14   important part of this story.

15        I'd like to make just three other points, part of
16   which have to do with Ms. Savoie's case and part of it to
17   the overall case or conspiracy.

18        First, in contrary to all that's been written and
19   said, this is not a political case.  The government has
20   never -- this district has never received any pressure from
21   Washington, D.C. to make this a political case.

22        Nor are the charges, as Ms. Savoie's aunt termed
23   it, ego-dystonic.  This case is not about politics nor egos.

24        Second, contrary to all that's been written and
25   said, the government's recommendations have not been

1 overreaching. Indeed, there's some people who would say and
2 have said, we are not really being tough enough. In fact,
3 if you ask Mr. Swanson, he would say that. I expect that if
4 we talked to most, if not all of the victims in this case,
5 that they too would say that. And I think all of us can
6 understand and appreciate that.

7 But as we have indicated to the court beforehand,
8 the government took many months in formulating these
9 recommendations. We consulted with all of the law
10 enforcement agencies who were part of the Operation Backfire
11 Task Force. We consulted with United States attorneys
12 offices and district attorneys offices in other districts
13 and states. And as Mr. Engdall has indicated, we vetted
14 this -- these recommendations with -- throughout our office,
15 up to and including the United States Attorney. We have
16 tried to be fair and proportionate but at the same time
17 adhere to the guidelines.

18 Third, contrary to all that's been written and
19 said, the government has never intended or attempted to
20 label anyone as a terrorist.

21 Last week, there was an article in the *Los Angeles*
22 *Times*, the editorial section, written by Caroline Paul,
23 Jonathan Paul's sister. It's entitled, My brother, the
24 'terrorist,'" and the subtitle is, "The government is
25 distorting the word to get more notches in its guns."

1  That's just simply untrue.

2       It's true that we did argue the applicability of
3  the terrorism enhancement. In fact, I'm reminded of what
4  Mr. Weinerman said during the terrorism enhancement
5  argument. Why are we engaging in this tortuous exercise?
6  It's a roller coaster, up 12 levels and down 12 levels. And
7  of course, the reason is because we have a responsibility as
8  the government to adhere to the guidelines. And we believe,
9  after considerable research, that the terrorism enhancement
10 applied.

11      But after -- we felt that after the -- we looked
12 at the resulting sentences using the terrorism enhancement,
13 and we felt that they were unfair. And that's why we relied
14 on 3553(a) factors in formulating our recommendation,
15 despite the fact that technically our 5K1.1 motion should be
16 based exclusively on the extent of substantial assistance of
17 the defendants.

18      So at the conclusion of your calculations, we
19 would ask the court to impose a sentence of 63 months and to
20 order restitution as shown on Government Exhibit 14.

21      Thank you.

22      THE COURT: Mr. Kolego.

23      MR. KOLEGO: May it please the court, Your Honor,
24 we have never alleged that this is a political trial or that
25 this is a political case. It's a criminal case. As I told

1  Ms. Savoie from the beginning, I represent individuals, not
2  causes.

3          And Ms. Savoie, upon contact with the government,
4  was presented with a dilemma. She could have held tight or
5  she could have accepted responsibility. And her instinct,
6  from the very beginning, was to accept responsibility. She
7  hasn't been -- she's 29 years old. This is the extent of
8  her criminal involvement. She was the lookout in the
9  Superior Lumber case, one of the lookouts, and she was a
10  lookout and a driver in the Jefferson Poplar case.

11          And she voluntarily stopped any kind of illegal
12  activity in 2001 because she realized that it was
13  counterproductive and wrong. She wasn't comfortable with
14  it, and she moved away from it and into a sustainable --
15  instead of trying to grab publicity, she became quiet and
16  tried to be a good citizen. She moved to the woods. She
17  works. She lives a sustainable lifestyle. She works with
18  developmentally disabled adults, and she tries in every way
19  to be a good citizen.

20          And while certainly I'm not going to defend the
21  methods used, fire is wrong, arson is wrong, and Ms. Savoie
22  understands that. That's why she stopped her involvement in
23  2001. But I do want the court to have a little bit of
24  insight into how Ms. Savoie arrived at this juncture. She
25  grew up in Southern California and watched empty spaces be

1  encoached and more and more buildings, more and more
2  freeways and all wild and precious places that she saw as a
3  child be paved over. And it became apparent, when you live
4  in the LA basin and you see what human activity will do if
5  it's unchecked, and we all live a life of consumerism, and,
6  to an extent, our economy is based on consumerism, we have
7  to keep it going, that ultimately it's defeating to
8  everybody. It's self-defeating. It's going to put us in an
9  unsustainable position.

10      And being young, being idealistic and being here
11  in Eugene where there was a ferment at the time, there was a
12  culture of people, young, intelligent, motivated, dedicated
13  people. And I don't think she'd agree with this
14  characterization, but I think she was caught up in that.
15  She was caught up in it because it mirrored her ideals.
16  There were people who were committed to the idea that if we
17  are going to survive the 21st century, we need to cut back a
18  little bit on our consumption. We need to learn how to live
19  with the resources that we have. That doesn't justify what
20  she did, but it explains how she reached this juncture.

21      And after her minimal participation, the
22  government's in agreement that her role was minor in both
23  cases, she got away from it. She has done a -- she walked
24  the walk. And when contacted by the government, she
25  appeared voluntarily. She's been on pretrial release.

1  She's performed perfectly on pretrial release. And
2  confronted with a dilemma, she was, at the very beginning,
3  willing to accept personal responsibility.

4        But as always, in cases when you want to accept
5  responsibility, you have to completely delineate what your
6  role was. And of necessity, not by any choice of hers and
7  not because she wanted to lessen her responsibility by
8  dumping blame onto other people, but of necessity, she had
9  to reveal what other people's roles were. And she -- that
10 was a very difficult dilemma for her because, while she was
11 willing to accept personal responsibility for what she had
12 done, she had problems incriminating other people. But it's
13 just the nature of the system.

14       And as a result, she's -- I have submitted some of
15 the -- samples of the materials that have been circulated by
16 Ms. Savoie in the environment -- elements of the
17 environmental community have labeled her as a traitor, as a
18 rat, and a snitch, and there's been a lot of stuff out on
19 the Internet. Plea agreements have been posted. There's
20 pieces of discovery that are not supposed to be floating
21 around are floating around Southern Oregon, and even
22 Ms. Savoie's husband has been targeted as an FBI informant,
23 although he's never talked to the FBI.

24       So she's accepted that. She's willing to accept
25 responsibility. And we think that the government has dealt

1  fairly in this case. We don't have any problem with the way
2  that the government's dealt. But we do believe that the
3  plea bargain doesn't fully take into consideration the price
4  that she's paid for her cooperation. And we -- she's been
5  labeled. It's obvious that she's going to continue to
6  suffer from this. And we are asking the court to
7  consider other issues, but we are asking the court to
8  consider a lesser sentence than what the government's
9  requested.

10  With respect to the -- the court has previously
11  ruled that the -- in other cases that the Superior Lumber
12  arson didn't qualify for the terrorism enhancement. The
13  court did rule vis-a-vis other defendants that the Jefferson
14  Poplar fire did, and that was based on the communique.
15  There's no evidence that Ms. Savoie had anything to do with
16  authoring the communique. The primary parts of the
17  communique refer to corporations that are threatening
18  biodiversity and that can't be -- I will quote directly, if
19  I could. "Because hybrid poplars are an ecological
20  nightmare threatening native biodiversity and ecosystems.
21  Our forests are being liquidated and replaced with
22  monocultured farms by earth raping corporations."

23  And at the time that's how Ms. Savoie felt. That
24  by tampering with nature that you are tampering with the
25  entire ecosystem. That everything is interrelated.

1                  And rather than being some sort of pagan nature

2   worship, this is a real profound respect for human life, the

3   understanding that we are all interrelated, and if you

4   threaten one part of the environment, it threatens us all.

5                  But it doesn't justify it. I'm just trying to

6   explain how she arrived at this intellectual juncture. And

7   certainly nothing justifies that, and Ms. Savoie knows that.

8                  But we submit that the government hasn't met the

9   burden of proving by clear and convincing evidence in the

10   Jefferson Poplar case that her motivation was to influence

11   the government in any way. Her motivation, although it was

12   wrong, was to stop what she saw as a severe problem that

13   when we start tinkering with the very mechanics of the

14   reproduction of life, that we are -- we are opening a

15   Pandora's box.

16                  Ms. Savoie is here. She's accepted

17   responsibility. She -- from the very beginning. She wants

18   to serve whatever debt she owes to society, and she wants to

19   get out and continue to be a productive member of society.

20                  There was one other issue I wanted to address, and

21   that had do with recommended condition number 8, that

22   defendant shall not have contact with individuals known to

23   be involved in or who have been involved in any

24   environmental or animal rights activism.

25                  While she's certainly willing to refrain from

1   contact with people who have engaged in criminal activity,

2   it's our belief that that improperly restricts her freedom

3   of speech and association and that that requirement is

4   overly broad.

5         We are asking the court not to apply the

6   sentencing enhancement in Ms. Savoie's case because the

7   government has not met its burden of clear and convincing

8   proof in this particular -- vis-a-vis this particular

9   individual that her motivation was to influence the

10  government.

11        And we are asking the court to consider a sentence

12  of 30 months, which is a substantial amount of time.  It's

13  two and a half years, and she -- for her minor involvement.

14  And there will be other consequences, including restitution,

15  that will follow her for the rest of her days.  And

16  Ms. Savoie is profoundly sorry for her involvement in this,

17  sorry for the effect that she's had on people in both

18  communities, in Glendale and Clatskanie, and came to this

19  realization on her own some time ago.  The reformation has

20  already been accomplished, and she's willing to pay the

21  price, but we submit that 63 months is more than is

22  necessary to accomplish the court's purposes under U.S.C. 18

23  3553(a).

24        And I would like to ask -- about four family

25  members want to speak on her behalf.  It wouldn't be in the

1  form of testimony like from Mr. Swanson.

2          THE COURT:  That's fine.  But I do want Mr. Ray to

3  have an opportunity to respond to your argument about

4  information that substantiates the communique that's

5  separate and apart from a debriefing, which I ruled

6  previously, I think that's the only information that we

7  have --

8                  (Feedback in microphone system.)

9          THE COURT:  I would like Mr. Ray to discuss for

10 the record the basis under which Ms. Savoie would be

11 responsible for the terrorism enhancement, acknowledging

12 that she has made statements in her debriefing and I have

13 ruled specifically with regard to that.  I have ruled, and I

14 can refer to that, but I'm wanting Mr. Ray to make his

15 record.

16          MR. RAY:  May I have just one moment?

17          THE COURT:  Um-hmm.

18                  (Counsel conferred.)

19          MR. RAY:  May I have just another moment?

20          THE COURT:  Um-hmm.

21                  (Counsel conferred.)

22          MR. RAY:  Would the court like me to respond now?

23          THE COURT:  Yes.  Or if you wish to wait, I want

24 that question answered, I'm happy to go ahead and hear the

25 four family members speak on Ms. Savoie's behalf.

1          MR. RAY:  If you don't mind, I'd like to do that,

2    and give me an opportunity to gather my thoughts.

3          THE COURT:  All right.

4          Go ahead, Mr. Kolego.  If you would ask the

5    individuals just to come up and stand by the podium, I think

6    the podium has a live mike in it, and that will assist the

7    court reporter.

8          MR. KOLEGO:  I'd like to have Jane Wright please.

9          MS. WRIGHT:  Can you hear me?  Can you hear me?

10          THE REPORTER:  Could I have your name and your

11   spelling, please.

12          MS. WRIGHT:  My name is Jane Wright, W-R-I-G-H-T.

13          I am the mother-in-law of Suzanne Savoie.  And I'm

14   hearing for the first time today what she actually pled

15   guilty to.  And I recognize the seriousness of what she has

16   done.  But I did not know Suzanne at that time.  I met her

17   five years ago, almost to the day, when I returned from an

18   assignment as a Peace Corps volunteer in Africa.

19          The Peace Corps, by definition, is an organization

20   that tries to create change through nonviolent means.  And

21   when I met Suzanne, um, one of my first impressions of her

22   was her gentleness.  And so the revelations today about her

23   involvement have been very surprising to me.  I don't see

24   her that way.  She has never been a threat or violent in any

25   way toward anyone that I know of, even in her opinions.

She's not a militant person who demands that everyone agree with her or has the same way of thinking in order to get along and to exist in the world.

I was impressed with what her lawyer said. In fact, it was almost like he was reading what I had to say, because my impression of Suzanne, as I returned from Africa, was that she was very responsible for her actions. And her work with disabled adults showed a lot of patience and calm, assurances, and she showed great -- deep respect for the people that she worked with who were not able to live in the society at large. She's one of the only people I know that could actually do that job and with such dignity and grace.

I am truly sorry for the pain that must have been inflicted by the people who were affected in the fire. In a very, very small degree I have been attacked and been a victim of a mugging at knifepoint myself, and I know that kind of fear. And I know that Suzanne is really sorry for that too and that she respects human life and believes that it's sacred.

Her -- when I first learned that she was being indicted and arrested for her involvement, I understood that when she left Eugene, it was a way -- it was the beginning of her reformation. She was turning away from that life and from those people that she was involved with. And somehow she knew that that was not the right way to go.

1           It hasn't stopped her from still caring about the

2  environment and the earth.  She has found other channels,

3  other methods, legal methods, and to continue to work for

4  the things that she believes in.  And I admire that about

5  her because it is awfully intimidating to know that you are

6  being watched with every move that you make.  And I was

7  appointed her guardian when she was first arrested and asked

8  to report to the -- I forgot the name of the --

9           MR. KOLEGO:  Pretrial services.

10          MS. WRIGHT:  Pretrial services.  And Mr. Wodehouse

11  would call me from time to time to check on how Suzanne was

12  doing and if I knew where she was, and I always knew where

13  she was.  And she was very responsible and very -- took

14  great care.

15          But I want to emphasize that I believe that she

16  started to -- she made the realization before she was

17  ever -- there was ever a hint that she was going to be

18  arrested or that she was indicted for anything.  She made

19  that decision on her own without being pressured into it

20  from any source other than herself.  It's not just because

21  she got caught doing something that she suddenly became this

22  good person.  She is a good person, and she deserves -- she

23  has a lot waiting for her at home that will help her

24  reintegrate back into the community.  Thank you for

25  listening to me, and I hope that you will be as lenient as

1  you possibly can within the law.

2          Thank you.

3          MR. KOLEGO:  Your Honor, I will call Annette

4  Savoie.

5          MS. ANNETTE SAVOIE:  Good morning, Your Honor.  My

6  name is Annette Savoie.  Same spelling as Suzanne's name.

7          I'm Suzanne's sister.

8          Suzie is a loving, caring person.  She has never

9  physically hurt or harmed anybody and is not a threat to

10  society.

11          Suzanne loves her family and her friends and

12  enjoys spending time with them.

13          She is dedicated to living a peaceful life and is

14  sorry for her mistakes in the past.

15          Just a minute.

16          Suzie and I are very close.  We are one and a half

17  years apart in age.  We shared the same bedroom for 15 years

18  in our house.  We shared many things growing up together.

19  We were on the swim team together for the city and the high

20  school teams.  We had the same jobs, such as lifeguarding at

21  the pool, teaching swim lessons, and working at the swap

22  meet.  I also worked for developmentally disabled adults,

23  and now I work at the high school in my town.

24          We shared friends and traveled together, and I

25  love her very much and her family.  Her family and I hope

1    that she won't be in prison long, because she will be deeply
2    missed.

3              Thank you.

4              MR. KOLEGO:  I will call Luke Ruediger.

5              MR. RUEDIGER:  Your Honor, I came here today --

6              THE REPORTER:  Could I have your name and

7    spelling, please.

8              MR. RUEDIGER:  My name is Luke Ruediger,

9    R-U-E-D-I-G-E-R.

10             Your Honor, I came here today hoping to just speak

11   from the heart and do this off the cuff, but I felt like

12   because of the pressures and the emotional stresses, I chose

13   to prepare a statement instead.  So I will just read that.

14             My wife, Suzanne Savoie, and I live a simple and

15   peaceful life in the mountains of the Southwestern Oregon.

16   We met as neighbors in the mountains above my hometown.

17             I was sending down deep roots and she was looking

18   for a new way of life.  We have lived on the land throughout

19   our entire relationship.  Our focus is on homesteading,

20   farming row crops, flowers, herbs, and orchards, as well as

21   restoring the forest ecosystem we call home through

22   thinning, burning, and sowing native plants.  We are also

23   restoring an old country home and generating our own power

24   through alternative energy projects.

25             Working as a team, we have accomplished much and

1   have grown inseparable. With this love of the land comes

2   responsibility, and thus we strive to live sustainably and

3   work to preserve the wilderness that surrounds us.

4   My wife is an activist. She is not a terrorist.

5   Her concern and her actions come from a deep love of the

6   land, a love we share. What is in the past is just that.

7   It's history. For as long as I have known Suzanne, she has

8   been involved in legal, legitimate activism, engaging in the

9   local community through education, litigation, commenting on

10  official actions, and living her ideals through lifestyle

11  choices. These are all legitimate and acceptable forms of

12  public involvement. Suzanne is a productive and engaged

13  member of society exercising her rights to make a

14  difference.

15  I am asking today that you see past the rhetoric

16  and the politics and judge my wife for who she is. No one

17  of such commitment and character is to be served by a -- by

18  lengthy incarceration. She is not a threat to society or

19  her community. Quite to the contrary, she will be missed.

20  I married Suzanne last June, and despite her legal

21  situation, I see a bright future for us and will be awaiting

22  her return. Her absence will be felt daily in all aspects

23  of my life, and I love her sincerely, and I understand that

24  in some ways she must sacrifice for her actions. I'm simply

25  asking you today that you consider a sentence that reflects

1   who she is today, a sentence that will cause the least

2   possible disruption to her and her family.

3           Thank you very much.

4           MR. KOLEGO: And I will call Ms. Dong.

5           MS. DONG: My name is Joy Dong, D-O-N-G.  I am

6   Suzanne's mother.  And I also would love to speak from my

7   heart, but the emotions, and there are so many, and you,

8   Your Honor, being a mother, know that if your child is in

9   pain, you, as a mother, are in as much pain if not more.

10          And I am so sorry for what she has done.  And

11  Mr. Swanson, I'd like to personally apologize to you and

12  your family and all of your members of your work group for

13  the part that Suzanne took in the arson, because it was

14  wrong and she was not raised to do anything wrong.

15          And I'd like to just remind you a little bit of

16  how she was raised.  We -- my children were born in Orange

17  County in Southern California, but I made a conscious

18  decision to move to a rural community when Suzie was only

19  three months old so that they would know what nature is and

20  to grow to love nature, because it certainly isn't concrete

21  and buildings.  It is the glory of the trees and livestock

22  and everything that God has put before us on this earth.

23          In addition to having a two-acre parcel and

24  raising our own meat, to which unfortunately caused a

25  problem because they were butchered on our property, and

1  maybe that was one of the sparks that chose her to protect
2  animals instead of raising them and eating them.  She was a
3  very involved girl.  She was in Girl Scouts for about eight
4  years.  As her sister said, she was on the swim team for the
5  city and then for the high school.  They swam for a total of
6  12 years.  And I believe Suzie even made it to Junior
7  Olympics.  So she was a good kid.  She was a very
8  intelligent kid, an introspective child.  And she really
9  never did anything wrong.

10        She was also a drummer in a band.  She helped me
11  garden.  Our family traveled and camped and did all the good
12  things that you are supposed to do as a family.  She
13  increased her travels during college to going to -- she was
14  in Wales for a year and traveled throughout Europe as best
15  she could on her -- the money that she had.  And possibly
16  because of her travels, her education, her love of
17  literature, and then her eventual involvement with the
18  activists, maybe she wanted more than a normal Southern
19  California lifestyle.  She is not materialistic.  They live
20  on such a meager subsistence, I am proud of them and don't
21  know how they do it because our society is so engrossed in
22  things.

23        She is a hard worker, learning with her husband,
24  as Luke has already mentioned, how to keep and build their
25  own solar-powered house, cultivating a huge half-acre garden

1   and orchard and making -- also making her own furniture.

2        It's been very evident that many Americans are

3   discontent. We grossly overspend, we overuse our resources,

4   and there are more shootings in schools and workplaces, and

5   our own personal fulfillment doesn't necessarily come from

6   our work or sometimes not even from our family but from the

7   passions that we acquire. And Suzanne's passion happens to

8   be caring about the natural resources. Not only preserving

9   them and educating others about how to have a sustainable

10  future for all, but growing up in the LA area, you realize

11  how drastically important it is to save our forests.

12       I thank God Suzie's involvement with this group

13  was very short term, ending in June of 2001. That because

14  of her own personal ideals, she turned back to only legal

15  activism.

16       As previous testimony, whether it was today or in

17  previous documentation, my daughter is intelligent,

18  compassionate, and loving. It's already been mentioned her

19  caring for the mentally challenged, which is a huge -- takes

20  a huge amount of patience and endurance. I worked in the

21  hospital for -- the hospital system for 39 years as a

22  respiratory therapist, and the mentally challenged are

23  just -- take so much compassion and patience.

24       Because of her commitment and love for her husband

25  and both of our families, Suzie definitely chose to do what

1 is tough when you are passionate about something, but she
2 fully cooperated with the FBI from day one, turning herself
3 in. She wasn't arrested. She turned herself in. And she
4 has accepted responsibility. This decision had many
5 ramifications, as Mr. Kolego already mentioned, ostracizing
6 them from a whole lot of their friends, even making it
7 difficult for Luke's family in the activist community.

8          They also have an extreme financial burden because
9 they are a young couple just living off their land. Not
10 all -- not -- and in addition, there is the emotional strain
11 for our entire family.

12          I agree that anyone should be punished for his or
13 her illegal actions. And I'm asking for myself, for
14 Suzanne's father, and her oldest sister, who, for financial
15 reasons, couldn't be here today, for forgiveness and
16 compassion from the court. We have all made mistakes in our
17 life, especially in our youth, when the full awareness of
18 eventual consequences aren't fully comprehended. And I feel
19 that Suzanne's passion was misguided during this certain
20 time. But she and her family are remorseful and sorry for
21 the damage, emotional and financial, to all of those that
22 are involved, and I also asked for lenience, Your Honor,
23 because my daughter is a good girl and I love her.
24          Thank you.
25          MR. KOLEGO: That's all I have, Your Honor. This

```
 1   is just an attempt to give the court an idea of who she is
 2   as an individual.
 3            THE COURT:  Anything -- do you need some time to
 4   respond?  Because I'm going to a break.
 5            MR. RAY:  Okay.  Can we take a break?
 6            THE COURT:  Yeah.  We'll take a break.
 7            THE CLERK:  Court is in recess.
 8                         (Recess.)
 9            THE COURT:  Please be seated.
10            THE COURT:  Mr. Ray.
11            MR. RAY:  In response to the court's inquiry, the
12   government has six pieces of evidence that go beyond
13   Ms. Savoie's debriefing tying her to the Jefferson Poplar
14   Farm arson and the communique.  The first of those is
15   Attachment 1 to her plea agreement which, significantly,
16   refers to several things.  It talks about -- in addition to
17   her acknowledgment of her full participation in the
18   Jefferson Poplar arson, it refers to a reconnaissance well
19   before the arson.  It refers to a planning meeting.  It
20   refers to Ms. Savoie being the driver and lookout, but
21   driving from Olympia, which is where Mr. Zacher [sic] and
22   Block live, to Clatskanie, and then back to Olympia.  And
23   then finally, it talks about the communique that was
24   prepared afterwards.  That's first.
25            Secondly, we have Mr. Ferguson's statement that
```

1 | Ms. Savoie was a participant in the reconnaissance of the
2 | Jefferson Poplar Farm arson sometime before the arson
3 | actually occurred.

4 | Third, we have Ms. Phillabaum's statement that
5 | Ms. Savoie was present during the planning meeting for the
6 | Jefferson Poplar Farm arson, which was, as the court knows,
7 | part of the double whammy including the University of
8 | Washington.

9 | Fourth, we have the statement of Mr. Block that,
10 | although he does not name names, he says that all the
11 | participants, the group, were present at his and
12 | Ms. Zacher's home, and that they discussed -- they all
13 | discussed the communique before the arson. And that after
14 | the commission of the arson, they all drove back to Olympia,
15 | and after they slept, they -- the group discussed the
16 | finalization of the communique.

17 | Fifth, we have the statement of Ms. Zacher, who
18 | corroborates what Mr. Block said but also says that
19 | Ms. Zacher and one other female, again, declining to name
20 | names, but refers to one other female being present for the
21 | discussion of the communique. And of course, the only other
22 | female was Ms. Savoie.

23 | Finally, we have the communique itself. And we
24 | would submit that that's sufficient to prove by clear and
25 | convincing evidence, beyond her debriefing, her

1    participation in Jefferson Poplar Farm.

2              THE COURT:  Mr. Kolego, if you need to respond,

3    I'm happy to hear you.  Otherwise, I will call on --

4              MR. KOLEGO:  Paradoxically, and given the nature

5    of our plea agreement with the government, it's almost

6    better if Ms. -- it is better if Ms. Savoie gets the

7    terrorism enhancement because then they are obligated to

8    make a 5K1 motion for downward departure based on

9    substantial assistance.

10              If we could ask the court for an additional

11    departure, because it doesn't fully take into consideration

12    the quality of what she's done.  Otherwise, we are stuck

13    with a five-year mandatory minimum, which is a 60-month

14    sentence.

15              So given that, I'm going to leave it to the court.

16              THE COURT:  Ms. Savoie, have you had a chance to

17    read the presentence report?

18              THE DEFENDANT:  Yes, I have.

19              THE COURT:  Have you had a chance to talk it over

20    with Mr. Kolego?

21              THE DEFENDANT:  Yes, I have.

22              THE COURT:  Any additions or corrections you want

23    to call the court's attention to?

24              THE DEFENDANT:  No.

25              THE COURT:  Is there anything you'd like to say

1    before I impose the sentence in this case?

2              THE DEFENDANT:  Yes, I have a statement.

3              THE COURT:  And if it's helpful to be seated so

4    that the microphone is closer to you so that the court

5    reporter can hear you, that would be fine if you want to be

6    seated.

7              THE DEFENDANT:  Your Honor, I know what I have

8    done is both serious and illegal.  I take full

9    responsibility for my actions, and I regret the pain it has

10   caused for everyone involved.  I am sorry for the potential

11   danger I may have created for firefighters responding to

12   these fires.

13             I can say with absolute certainty that I will no

14   longer engage in unlawful activities upon my release from

15   prison.  In fact, since 2001, I had taken great steps to

16   enter a new era in my life.  I bought property, met and

17   settled down with my husband in a little house in the

18   mountains with a dog and cat.  I spend my days gardening,

19   doing rustic woodworking, forest restoration, and until --

20                  (Reporter interrupted.)

21             THE DEFENDANT:  I have bought property, met and

22   settled down with my husband in a little house in the

23   mountains with our dog and cat.  I spend my days gardening,

24   doing rustic woodworking, forest restoration, and, until

25   now, working at a home for developmentally disabled adults.

1    In 2001, I decided to devote my time exclusively
2  to legal environmental work. Upon my release, I will
3  continue to work toward a sustainable future through purely
4  legal means.

5        I also would like to use my time in prison to
6  further my education and possibly help others as well. I am
7  now and I have always been nonviolent in nature. I have
8  been determined to make positive changes in the world in
9  many ways but my focus has always been on saving the last of
10  our native ecosystems.

11       After moving to the Northwest and watching the
12  last of our old growth forests dwindle away and doing
13  everything legally possible to prevent that, I grew
14  desperate with the dire predicament that our natural world
15  is disintegrating at an ever increasing pace.

16       I took part in these actions because I felt
17  something had to change fast if we wanted to slow the
18  onslaught of the industrial world. However, I now feel it
19  is wrong to use arson to influence public policy. I was
20  misguided to think these actions would achieve my goals.
21  Old growth trees are still being cut across the Northwest,
22  and genetic engineering is more rampant than ever.

23       For me, these actions came from a place of passion
24  and a critical passion for the land, and I am worried about
25  my family being left a future with no wilderness and no

1  place for rural and indigenous people to live off the land.

2       I want to thank my husband and my family for

3  standing by me in these hard times and for maintaining their

4  belief in me as a kind and gentle person who deeply cares

5  about the health of the earth.

6       Thank you.

7       THE COURT:  Ms. Savoie, first I want to talk to

8  your family, because the pain in the room is palpable.  What

9  parents and families do for young people is give them roots

10  and wings.  And your family did that.  And you are one of

11  the more intelligent people to appear in this courtroom.

12  You are articulate, you are smart, you are Phi Beta Kappa.

13  You are intelligent and caring.  No question about it.

14       Whatever happened, whatever sparked the side of

15  you that created destruction and damage to other people must

16  leave you puzzling days and nights to understand what or who

17  you were when that occurred, because sitting on the front

18  pew is a person raised in a very similar setting,

19  appreciative of the environment, worked in the environment,

20  and coming back to his own community to build community and

21  to provide a sustainable lifestyle for people who need to

22  work.  Two sides of an issue that we are debating in very

23  unhealthy ways through destruction or through a failure to

24  recognize that the science of the world is telling us we are

25  in a crisis.  It needs to be said.  It needs to be

1    respected.  And we need to take action.

2         What desperate people do when they are given

3    information and have no outlet or don't participate now has

4    disrespected the ability to talk about some of these issues

5    in a way that may further move the world ahead before the

6    time runs out.

7         Now, we all read widely, at least I hope everyone

8    reads widely, and you read the science out there, NASA

9    scientists, and they gave us a ten-year ticking clock.  Two

10   of those years have passed.  And the lectures I have been

11   listening to say we have eight years before we reach a

12   tipping point.

13        So I understand, like everybody else in this room,

14   sort of that passion and urgency you felt as a young person.

15   And then you went off with a group of people who took your

16   true beliefs and used them to damage lives and people.  And

17   somehow you got caught up in that escapade.  Dangerous,

18   dangerous, dangerous escapade.

19        That's a puzzle you have to look deep inside

20   yourself, and your parents can't solve that.  They can't and

21   shouldn't take responsibility that they caused it or did

22   something.  They gave you what you needed.  And something

23   sparked inside of you that led you down a path.

24        But thank goodness you made a conscious decision

25   to walk away.  That should mean a great deal to every single

1  person in this room, including the Swanson Company. You
2  walked away. You walked away.

3      Now, I brought this ball, because on the days we
4  haven't had the sentencing, we have lots of other work.
5  Lots and lots and lots of other work.

6      But I'm reminded every day that what I deal with
7  in the courtroom is the damage of what's not done in other
8  places. So with what time I have, I try to spend it with
9  young people, because you are our greatest resource. And
10 you are the people who we'll hand the world over to at some
11 point. And on this red ball, I'm going to tell the story,
12 because I really do think whatever you have in your mind
13 that goes into the prison with you will help you sustain
14 your commitment.

15     And the story of the red ball, and it will come --
16 you will understand why I'm telling the story at the end.
17 The story of the red ball starts with a young man in
18 Philadelphia, middle son of three boys. Six years old, with
19 a mother and no father and a lifestyle that was total chaos.
20 And when his mother got mad, she would pick up and move with
21 the children, and it always happened after school.

22     But one day it happened during school, and he's
23 walking down the hallway with his eight-year old brother,
24 mad, because the one thing that he cared about was school,
25 and it was a safe place, and he was being taken from school.

1  And they walked to the office, and the mom said, we are

2  moving.  We are leaving now.  Get in the car.

3       There is nothing anybody could do.  They got in

4  the car.  And they drove and they drove and they drove, and

5  their little brother, three, was seated next to him.  All

6  three in the backseat, driving and driving, and she wouldn't

7  tell them where they were going.  And they were scared and

8  they didn't understand.

9       The next thing you know, they end up -- it's after

10  dark.  They drive up a dark road, and they are in a trailer.

11  And she locks the door behind them and says, don't leave the

12  trailer until I come back.  Two days passes.  Two days goes

13  by.

14       Is it the oldest boy that steps up and does

15  something?  No.  It's the six-year old.  He said, there's a

16  school bus that went by.  We are supposed to be in school.

17  We are supposed to do that.  We need to go tell on our mom.

18       So he opened the door and he looked out, and they

19  saw a house down the way, and he said, come on.  The little

20  six-year old took his eight-year-old brother and his

21  three-year-old brother and they walked to the neighbors.

22  And they knocked on the door, and they said, we are supposed

23  to be in school and our mom is gone.  Can I use the phone?

24  The lady says, why do you want to use the phone?  Well, my

25  grandfather gave me his phone number and always said if I

1    was in trouble, I could call.

2              So he called his grandfather.  His grandfather is

3    in Philadelphia.  And he said, well, where are you?  I have

4    been looking for you.  He said, well, I don't know where I

5    am.  Well, why don't you ask the really nice lady that let

6    you use the phone where you are.  And he said someplace in

7    Georgia.  And he said, you know, that's really too far for

8    me to come and get you this time.  So hand the phone back to

9    the really nice lady, and I will talk to you in a minute.

10             And the really, really nice lady got on the phone,

11   and he said, you don't know me, but I'm going to ask you to

12   do something.  I'm going to ask you to take the three little

13   boys down to the bus station and put them on the bus back to

14   Philadelphia, and I promise you, I will meet them and I will

15   pay for those rides.  It's 1967.  They are three

16   African-American boys.  She takes them down, puts them on

17   the bus.  They are scared out of their mind.  And they ride

18   the bus back to Philadelphia.

19             And then they are angry at everybody and

20   everything and lost.  Nobody there for them.  And the little

21   six-year old knows that a playground is a safe place to be

22   and a place where he can be happy.  So he goes there looking

23   for friends.  No one's there.  But he finds a red ball.  And

24   he takes that ball and he kicks it and he kicks it and he

25   chases it and he kicks it and he chases it.  And he's

1  laughing and he's outside himself, and all the bad things
2  are gone.

3          And the next thing, there's a group of kids there.
4  He didn't even see them coming.  They said, hey, you want to
5  play.  So he ran over to them and he played.  But he wasn't
6  known as the kid with the mom who left him.  He wasn't known
7  as the child who had nobody in his life that would really
8  step up for him other than his grandfather.  He was just
9  known as the little fast kid.  So he'd go back to the
10  playground day after day and play with these kids, known as
11  the little fast kid.

12          But on that first day, he saw the ball, it was
13  being left behind, he said, well, does that ball belong to
14  anybody?  They said no.  And they said, you take it.  So he
15  took that ball with him.  And he tells this story as he
16  moves on in his life and gets an advanced degree.  He speaks
17  now five or six languages.  His goal in life, because what
18  he learned from the red ball, is that you have to have a
19  dream.  And the red ball to him meant, I am going to find
20  some way in my life to contribute to make people happy and
21  make people get outside themselves and make them understand
22  that they can really be kind and generous when they are
23  doing something they love.

24          And so he said, I'm going to one day work for the
25  NBA.  He's shorter than I am.  He's like five, four.  And

1    everybody would laugh at him about his dream. But five or
2    six languages later, he's sitting on the bench as a trainer
3    for the Philadelphia 76ers because that was his dream. And
4    when he yells in Eastern European languages at other
5    players, they came over and said, who's that smart, fast
6    little guy over there? So he ends up coaching the Olympic
7    team for Eastern European countries.

8              And as he goes about the business, he picks up a
9    red ball -- he picks up balls all over the world to teach
10   kids about finding what gives you joy and happiness and
11   making a difference in people's lives. He's gone all over
12   the world. And guess who figured out he might be somebody
13   that they should bring into their company? Nike. Just to
14   teach joy and to work with kids.

15             So he came in their company. They have their own
16   issues to deal with. But he came into their company because
17   they respected that he was out trying to make a difference
18   for other kids. And within that company, you know what he's
19   known for? He's known for the "LIVESTRONG" bracelets. He's
20   known for the bracelet they retired when he left so he could
21   go around the world and talk about bringing joy and bringing
22   happiness and finding outlets that give people a positive
23   way to be in their community. And his bracelet is clear,
24   and it says "DREAM" on it.

25             Why I tell this story is here's a kid who had

Case 6:06-cr-60080-AA   Document 33   Filed 07/02/07   Page 48 of 69

1    nothing, and look what he's done with his life. That's the
2    story I told to Thurston kids. I go to a freshman class
3    with kids who are at risk. Kids who don't have a dream.
4    Kids who don't know how to think beyond survival. Kids who
5    don't even believe that anybody's looking out for them. And
6    yesterday when they came, and I didn't want them coming in
7    on these sentencings, I had them come and actually sit in on
8    drug court. I talked to them about keeping a dream. That
9    dreams are really important and setting a goal and going
10   after them. And these are kids who don't have anything.

11        What has worried me in this case are all the kids,
12   now young adults, all of you had so much given to you and
13   opportunities made available to you, and yet you didn't
14   understand what that meant in terms of your responsibility
15   and the decisions you needed to make, both as a -- becoming
16   an adult and being responsible. Instead of taking the
17   responsibility, your actions were incredibly immature,
18   self-centered, self-righteous, arrogant, black-and-white
19   thinking.

20        So I -- the kids -- this was on their own; I was
21   stunned -- walked in, and each one of them wrote what their
22   dream would be. And I can tell you I have been out there
23   four or five different times, once a month. When I first
24   met with them, everybody here will tell you, I came back and
25   thought, I don't know that those kids really will have an

1  ability to figure out what a dream is for them.  Doesn't
2  take a lot of effort.

3  And as much as I appreciate and admire the work
4  you do with the developmental disabilities community, which
5  is an unbelievable gift to be able to do that, the way you
6  have to repay this community and this society is you need to
7  go talk to kids about what it means to make bad decisions.
8  What does it mean to follow a crowd or a bad boyfriend or a
9  bad friend and how those decisions and the moment of wanting
10  to be part of something can ruin your life.

11  Because last night -- I read these sentencings one
12  night ahead.  It's like mind pollution, because I have to
13  read about wonderful people who had so much potential and
14  made absolutely ridiculous criminal decisions.  I really
15  only want to hold that in my head so long, just as everyone
16  in this room sees the waste of a person with your capability
17  spending time incarcerated for acts that you knew better
18  than to commit.

19  It isn't like a day when I have a kid in front of
20  me who never really understood those choices.  They have a
21  different feel.  These days feel very hard because of the
22  waste of a talent and a person who should have known better.
23  I don't think either your mother-in-law or your mother could
24  have said it better.  They are beyond shocked at who you
25  were during that period.  But just as most parents will tell

you, you are only as happy or as satisfied as your child having the hardest day. For the rest of your life after you have children, every day is which child is having the most difficult time, and that's sort of where you are as a parent. If your children are all doing well, it's a great day. If one of them is struggling, you struggle with them. But you can't be more responsible than giving them roots and wings and hoping that they internalize those decisions and remember those decisions, or at least call home.

The little six-year old -- wasn't the eight-year old. The little six-year old knew the lesson to call home when something was going wrong.

All of the participants in this, why didn't you call the people who cared most about you?

How do you tell kids that their family will be there when you look around and there's no one else in the courtroom here that's going to stand by you. And in fact, the people you thought might stand by you are trashing you in the papers, in the blogs, in the press. They are just taking you to town. They weren't there for you. They used you. I don't think they said these words, but they are going, hey, Phi Beta Kappa. Got a smart one.

I'm not saying these things to be mean. I'm saying these things to have you think through what message you can tell young people when you come out to make a

1   difference.  That's how you are going to pay back.  To make

2   a difference with the young people who down there think,

3   well, why not.  Other people did this.

4            So yesterday when the class came through and sat

5   in on drug court, and as the teacher e-mailed me this

6   morning, they have never sat still for an hour before.  I

7   cannot wait to hear what they have to say.  Of course, they

8   broke loose on the bus and the elevator.  But I can't wait

9   to hear what they have to say, and one of the drug court

10  members is going to go debrief with them just to talk

11  through it.  And he's sitting in on drug court because he's

12  going into prison after he finishes his term at LCC.  But

13  he's learned a lesson.

14           So I say all this because there are two things

15  that are important in a sentencing.  One, to hold you

16  accountable for the criminal behavior that you conducted at

17  the expense of individuals in the community; and second,

18  that it is about your coming back into this community

19  committed, committed to being the person who will give back

20  and who will prove that when you go in and you take

21  responsibility and you accept your punishment or your -- or,

22  in this instance, your jail time, and you contribute in that

23  institution to the best of your ability, and when you come

24  out, everybody, every community person should give you the

25  opportunity to be successful and contributing, because you

1   have paid your debt to society.

2          And now what we expect is you to come back and
3   provide in your own way a way to give back to the community.
4   You are going to owe money for the rest of your life to pay
5   the debts because, joint and severally, I think it will take
6   beyond your economic wherewithal to pay back the loss to the
7   companies and to the businesses. And that's just going to
8   be part of what you have to do to make amends.

9          But more than that, but more than that, just
10  living simply on the land and living a sustainable life and
11  staying committed to your passions will not be enough.  What
12  I hope and I suggest you do is you talk and you work with
13  young people and you help give them someone that they can
14  say, I admire her taking responsibility.  I admire that she
15  changed her life and she cared enough to come help me keep
16  all my options open.

17         In some ways, asking kids to dream is too much.
18  Sometimes the best I can do is say, please try not to limit
19  your options with your criminal behavior.  Isn't that a sad
20  message to American kids?  Please don't limit your options
21  with your criminal behavior, because we don't have enough
22  services.  We don't have enough time for kids to be in
23  school and have extracurricular activities.  They don't have
24  swim teams to the extent you had them.  They don't have
25  those options.  We are taking that away.

1          And as a community, part of this debate in these
2   cases is we all need to look at a lot of things differently
3   and quit pretending someone else is going to fix it. It's a
4   bigger debate. It's way outside of the job description I
5   have. But it's nonetheless each and every person's
6   responsibility to be part of how are we going to leave this
7   place better for the next generation. Economically,
8   environmentally, resources, opportunities, educationally,
9   culturally, musically, how do we leave the world a better
10  place.

11          The lesson out of this case is it better not be
12  done with destruction and fire. Because out of these cases,
13  the next go-around of sentences will be far different than
14  the ones imposed in this case, because this is a case with a
15  message. And the message is it is the law of this country
16  that we will not fight our battles between and among
17  ourselves using violence and violent means. Our debates
18  will be about the issues and about the debates and a legal
19  means. That is how this country is founded, and those are
20  the decisions that we have made as a people. And your
21  family has taught you those ways, and they have acted on
22  them.

23          You are going to get credit in this sentence for
24  something I think that is extraordinary and I haven't seen
25  beyond Mr. Meyerhoff, and that is you surrendered yourself

1   and you walked in and you told the truth and you told of
2   your activities and you told of those parts that were hard
3   for you to tell about other people.  But you did that.  That
4   is to be respected.  And I appreciate that because it has
5   made a difference in how I think all of us have viewed this
6   particular sentencing.  In fact, it's been, I think,
7   articulated very well by Mr. Ray in balancing the
8   accountability for the actions and giving recognition to
9   what you as a person chose to walk away from and then
10  contribute to this investigation, because to get a complete
11  picture has required cooperation from so many people to
12  understand the magnitude and the complexity of these
13  escapades.  So for that, you will be getting credit.

14          I know today, I have no doubt, that when you come
15  out of prison, your family will stand by you and be there
16  for you.  I can't say that every day.  They will be there
17  and they will stand by you.  And they will be sentenced
18  right along with you.  That's the level of empathy that was
19  palpable in this room.

20          And you need to let them go.  You need to tell
21  them you will be fine.  You are going to do your sentence.
22  You are going to contribute.  You are going to learn a great
23  deal, a great deal while you are in prison.  And you are
24  going to come out, and you are going to be welcomed back
25  into a family that will sustain you emotionally for the rest

1    of your days. You have that to look forward to.

2    At the same time, I hope some day when you come

3    out you will write about what this has all been. You will

4    write it down. If you can't share it in a classroom, you

5    will write it down and talk about all this so that other

6    people can benefit from the struggle that you went through

7    to be the person you are standing here today.

8    So I have no doubt that you have made the

9    commitment to live a life that is law abiding. For all of

10   us in this room, we are grateful.

11   Destructive actions cannot and will not change

12   peoples' behavior, at least not in positive ways. They do

13   more damage. Targeting people for arson will create fear

14   and hostility, and you know you did that. But it simply

15   won't make the government or individuals examine their

16   policies or actions with respect to protecting the

17   environment. In fact, I suspect it's a huge setback to

18   having people even willing to come to the table and talk

19   about those issues.

20   People who disagree with you are never going to be

21   persuaded by destruction. In fact, they are just going to

22   become more hardened and the debate is more difficult to put

23   around a table and to talk about the balancing of needs.

24   And what's interesting is, in concrete thinking, is in many

25   of the industries, they are weighing that daily because the

1   public debate is pushing people to weigh issues in a bigger

2   sense.  And think of you taking your Phi Beta Kappa talents

3   to being positive about getting the debate going.  You might

4   have been one of those leaders out there talking about these

5   issues around the globe.

6           So in doing the calculations, which are really the

7   basis of where we start but not end, the offenses are

8   grouped pursuant to 3D1.1.

9           The conspiracy count, which is 06-60080, pursuant

10   to 3D1.2, is grouped with the underlying substantive

11   offense.  Accordingly, then, the conspiracy count is grouped

12   with the following offenses:

13           Count 2, arson of Superior Lumber.  The base

14   offense level for this offense is 6, with an upward

15   adjustment of 13 levels for amount of loss and two levels

16   for more than minimal planning.  Additionally, based on the

17   recommendations in the presentence report, I will include a

18   two-level downward computer -- downward adjustment for your

19   minor role in the offense.

20           The government contends that this offense

21   qualifies for the terrorism enhancement because Superior

22   Lumber harvested timber from the federal lands.  However,

23   the communique issued after this offense referenced Superior

24   Lumber as, quote, a typical earth raper contributing to the

25   ecological destruction of the Northwest, unquote, and that

1   the defendants hoped to see, quote, an escalation in tactics

2   against capitalism and industry, unquote.  It did not,

3   however, mention any government conduct in the communique.

4   Therefore, I find that the government has not established

5   that the offense was calculated to influence or affect the

6   conduct of government by intimidation or coercion, or to

7   retaliate against government conduct, resulting in a base

8   level offense of 19.

9        Counts 3 through 15, the arson at Jefferson Poplar

10  Farm.

11       The base level for this offense is 6, with a

12  13-level upward adjustment for amount of loss and a

13  two-level upward adjustment for more than minimal planning.

14  Additionally, based on the recommendations in the

15  presentence report, I will include a two-level downward

16  adjustment for your minor role in the offense.

17       As I found with the other coconspirators, the

18  statements in the communique reveals that the offense was

19  intended to send a message to the government that

20  legislation is ineffectual.  The enhancement requires that

21  the offense was calculated to -- even though defendants did

22  not prepare the communique, that you took part in the arson

23  as the driver and the lookout, and under the guidelines,

24  your relevant conduct includes the reasonably foreseeable

25  action of others taken during the commission of this

1  offense.

2  And in addition, I would note the specific pieces
3  of the puzzle, so to speak, or the reasons articulated by
4  Mr. Ray that further substantiates that finding.

5  Thus, I find the purpose of this offense was to
6  influence or affect the conduct of government. Because 18
7  U.S.C. § 844(i) is identified as a federal crime of
8  terrorism, a 12-level upward departure applies. However,
9  the application of the enhancement isn't meant to label you
10 or any other defendant as a terrorist. It recognizes that
11 elements of your offense involved using fear and
12 intimidation to achieve a goal and to affect the conduct of
13 government. Therefore, the offense level is 31.

14 Multiple counts -- or the adjustment of multiple
15 counts.

16 Pursuant as to 3D1.4, the combined offense level
17 for multiple counts is determined by taking the offense
18 level applicable to the group with the highest offense level
19 and increasing that offense level by a specified amount. In
20 this case, the group with the highest offense level is 31.
21 The offense level total of one unit is added. It results in
22 no additional levels. And then combined -- taking that fact
23 into account, the combined offense level becomes, then,
24 still a 31.

25 Under the sentencing guideline 5K2.0, I have the

1  discretion to depart where the guidelines do not adequately
2  take into account aggravating circumstances of the offense
3  conduct.  Here, 3A1.4 does not adequately take into account
4  your intent to frighten, intimidate, and coerce private
5  individuals at the Superior Lumber Company through your
6  actions.

7      Therefore, I exercise my discretion under 5K2.0 to
8  depart upward by two levels, resulting in an offense level
9  of 33, the offense level that would have resulted had the
10  enhancement been applied to the offense.

11      I note in the guideline calculation that you are
12  entitled to a three-level downward adjustment for acceptance
13  of responsibility, bringing the total offense level to 30.

14      Criminal history category.

15      You have 0 criminal history points, resulting in a
16  criminal history category of I.  However, under 3A1.4, your
17  criminal history category is established at a VI.

18      Unlike some of the other defendants, I utilize my
19  discretion pursuant to 4A1.3 and find that Category VI
20  significantly overrepresents your criminal history.
21  Criminal history categories are intended to consider prior
22  criminal behavior, protection of the public, and likelihood
23  of recidivism.  In this case, I find that a criminal history
24  category of VI substantially overrepresents your criminal
25  history, given the lack of serious or extensive uncharged

1   conduct and the lack of activities that would establish a

2   propensity to engage in criminal behavior, such as

3   continuing involvement with coconspirators, involvement with

4   drugs, or illegally purchasing, collecting -- and collecting

5   firearms, as was the case with other defendants.

6           Accordingly, I find that the Criminal History

7   Category II best reflects an appropriate criminal history

8   category for you.

9           The resulting guidelines range is level 30.

10  Criminal history category of -- with a criminal history

11  category of II.  The range becomes 108 to 135 months.

12          Mr. Ray.

13          MR. RAY:  Your Honor, the government would move

14  under 5K1.1 for a downward departure for substantial

15  assistance for five levels from level 30 to level 25, and we

16  would ask the court to impose a sentence of 63 months.

17          THE COURT:  Likewise, I have discretion to depart

18  downward under 5K2.0 for mitigating circumstances not taken

19  into account under the guidelines or to increase the

20  downward departure for substantial assistance under 5K1.1.

21          Here, I find that you rendered extraordinary

22  cooperation in self-surrendering and cooperating with the

23  government.  I also want to acknowledge your removal from

24  your prior activities before this criminal investigation

25  began, your genuine acceptance of the roles in the offense,

1   your timeliness in your cooperation, your truthfulness in
2   cooperation, and the consequences you are suffering and have
3   suffered as a result of your cooperation.

4           Because of that, I am departing downward by an
5   additional two levels for a final offense level of 23,
6   criminal history category of II, and a resulting guidelines
7   range of 51 to 63 months.

8           Ms. Robb, did I get those calculations accurate?
9           MS. ROBB: Yes, yes, Your Honor.

10          THE COURT: Before I impose the sentence, I would
11  really like to call on you as the presentence writer in this
12  case to add any additional comments.

13          MS. ROBB: What I can say in Ms. Savoie's case is
14  that typically when I -- someone comes into our office to
15  interview for the presentence investigation, they come to --
16  sometimes they accept responsibility for what they have
17  done, but in most cases, they want to try to present a
18  picture of themselves that's very favorable or over
19  favorable so they might get some benefit in their sentence.

20          And in Ms. Savoie's case, she came to me very
21  openly and honestly and said, I did this. I'm responsible.
22  And at no time did I feel she came to paint an over
23  favorable picture of herself to get a more lenient sentence.
24  She was just very accepting of what she did, and that is
25  where we don't see that very often. And so I would like the

1   court to know that information about her.

2           THE COURT:  All the information we know about you,

3   Ms. Savoie, is either contained in the written material

4   that's provided to the court or in open court by the

5   comments made.  And then the presentence writers have a vast

6   level of experience with various individuals, and they don't

7   generally speak up for people unless they really deserve it,

8   because most of the time it's just not that way.  So I want

9   to thank you for all the efforts you have made to become the

10  person that you were raised to be and the person that you

11  want to be and understand that when you serve your time, you

12  have paid your debt.  And every person in this room needs to

13  give you the chance to move on in your life and be

14  successful.  That's what this is about.  Pure and simple.

15          It is a sad day.  I grant you that.  It's a sad

16  day when we have to send talent away for a long time because

17  they made poor decisions.  But it reminds me, I think more

18  than most days, it reminds me of the two years spent in

19  juvenile court, 1800 kids in this community, most of them

20  without significant people in their lives to make a

21  difference, and where, as a community, do we spend our time,

22  effort, and resources.

23          I hope everybody in this room understands that the

24  battles that everybody fights are all well and good, but

25  unless we go and fight for the hearts and minds of our

1   children and raise them to care about one another and this
2   community and the bigger community and the ability to have
3   people work and earn a living, the ability to have people
4   have their own homes and be safe, the ability to truly have
5   what we are promised, and that is a life where we get to
6   make some decisions on our own, but it's truly all about
7   extending ourselves to one another and letting other people
8   make good decisions, not take them down a path where the
9   next thing you know, their options are foreclosed.

10          So you have to give back. You have to give back.
11  I implore you to go back to kids and tell them, do not, do
12  not stray from the principles that you understand and know,
13  because in the end, it's simply not worth it.

14          So I have taken into account 18 U.S.C. § 3553,
15  addressing the nature and circumstances of this offense,
16  your own criminal history and characteristics, protection of
17  the public, and to afford adequate deterrence for criminal
18  conduct in the future, as well as a variety of other factors
19  recited on the record, and have come up with a reasonable
20  but not greater than necessary sentence for the offenses to
21  which you have been convicted.

22          With regard to Count 1, you are committed to the
23  Bureau of Prisons for confinement for a period of 51 months.
24          With regard to Count 2 through 15, you are
25  committed to the Bureau of Prisons for confinement for a

1  period of 51 months to be served concurrent with the
2  sentence imposed in Count 1 and with each other.

3          You shall pay full restitution to the victims
4  identified in the presentence report in the amount of
5  $1,944,003.80, jointly and severally with the codefendants
6  Kevin Tubbs, Chelsea Gerlach, Daniel McGowan, Stanislas
7  Meyerhoff, Nathan Block, Joyanna Zacher.   Interest shall be
8  waived.

9          Upon release from confinement, you will serve a
10  three-year term of supervised release, subject to the
11  standard conditions of supervision adopted by this court and
12  upon the following special conditions:

13          First, you shall cooperate in the collection of
14  DNA as directed by your probation officer if required by
15  law.

16          Next, you shall pay full restitution to the
17  victims identified in the presentence report in the amount
18  of 1,944,003.80, jointly and severally with Kevin Tubbs in
19  case 06-60070; Chelsea Gerlach, 60-60079 [sic] and 60-60122
20  [sic]; Daniel Gerald [sic] McGowan, 06-60124; Stanislas
21  Meyerhoff, 06-60078 and 60122-02; Nathan Block, 06-60123;
22  Joyanna Zacher, 06-60126.

23          If there is any unpaid balance at the time of your
24  release from custody, it should be paid at the maximum
25  installment possible and not less than 200 or 10% of your

1    gross income per month, whichever is greater.

2            You are prohibited from incurring new credit card

3    charges or opening additional lines of credit without the

4    approval of your probation officer.

5            You shall authorize release to the U.S. probation

6    officer any and all financial information by execution of a

7    release of financial information form, or by any other

8    appropriate means, as directed by your probation officer.

9            Next, you shall participate in a mental health

10    treatment program if approved by your probation officer and

11    determined appropriate.

12            Your employment shall be governed to the approval

13    of your probation officer.  If you are underemployed, you

14    will have to seek different employment.  If you are in a job

15    you don't like and you want to quit, you are not allowed to

16    terminate without probation's permission.

17            You shall disclose all assets and liabilities to

18    your probationer officer.  You shall not transfer, sell,

19    give away, or otherwise convey any asset with a fair market

20    value in excess of $500 without approval of your probation

21    officer.

22            Next, you shall have no contact with individuals

23    known to be involved in or having been involved in any

24    environmental -- illegal environmental or animal rights

25    activism.

1          And if there are groups that you want to

2    participate in, you will provide a list and contacts to the

3    probation office, and they will be presented to the court.

4    And if appropriate, you will be given permission.

5          You shall not participate -- I think I have stated

6    that that goes -- subsumed the ninth special condition in 8,

7    and I think that will suffice.

8          I'm not ordering a fine. You have a substantial

9    restitution obligation to pay. That will be your first and

10   most primary obligation.

11         I will, however, impose the required fee

12   assessment in the amount of $1,500.

13         You entered into a plea agreement that waives all

14   or part of your appeal rights. If you wish to file notice

15   of appeal, you may do so. It must be done within ten days

16   of today's date. If you cannot afford to do so, contact the

17   clerk's office. It will be done for you and done for free.

18         MR. KOLEGO: Your Honor, I had spoken with the

19   government about getting a report date. They indicated they

20   have no objection to that. We are asking that she be

21   allowed to report July 2nd, and she'd like a recommendation

22   for Dublin, I believe.

23         MR. RAY:  That's fine with the government, Your

24   Honor.

25         THE COURT:  July 2nd at noon.

1       If you are assigned to Dublin, that institution is
2   one of the few that house all women, I would, again, hope
3   that you would use your time in there both either to teach
4   or to participate in any of the educational programs that's
5   available, but certainly to give back.

6       And if there's any issues, Mr. Kolego, regarding
7   her placement, you can bring that to the court's attention.
8   And like the others, I'd be happy to write a letter. I just
9   don't think there are going to be issues regarding that.
10  But --

11      MR. KOLEGO: I think that Mr. Cox indicated that
12  if she's self-reporting, the Bureau of Prisons is not going
13  to consider her a big security risk.

14      THE COURT: I appreciated what Mr. Cox had to say,
15  but I can tell you that in the final analysis, the Bureau of
16  Prisons does what the Bureau of Prisons decides is in their
17  interest to do, and for as much as that presentation was
18  helpful, at the end of the -- at the end of his testimony,
19  my conclusion was somebody will make that decision within
20  the Bureau of Prisons, and it may or may not reflect what we
21  recommend.

22      MR. KOLEGO: One other issue I wanted to raise on
23  behalf of Ms. Savoie's mother is that she posted some cash
24  for her bail, and she's not a woman of great means, and I
25  believe the bond will be exonerated at this point, correct?

```
 1          THE COURT:  That's right.  It might -- I was going
 2   to say it might last through her report to prison.
 3          MS. ROBB:  I can follow up on that, Your Honor.
 4          THE COURT:  I think it may -- I suspect they'll
 5   want to hold it through her report date, but we can
 6   certainly make that request.
 7          MR. KOLEGO:  Okay.  Thank you, Your Honor.  I will
 8   work with the U.S. Attorney's Office about that being
 9   used -- further used to secure her release.
10          THE COURT:  And Ms. Savoie, good luck.
11          THE DEFENDANT:  Thank you.
12          MR. KOLEGO:  Thank you, Your Honor.
13          MR. RAY:  Thank you, Your Honor.
14          THE CLERK:  Court is in recess.
15              (The proceedings were concluded this
16              31st day of May, 2007.)
17
18
19
20
21
22
23
24
25
```

1          I hereby certify that the foregoing is a true and
2     correct transcript of the oral proceedings had in the
3     above-entitled matter, to the best of my skill and ability,
4     dated this 2nd day of July, 2007.

5

6

7     _____
      Kristi L. Anderson, Certified Realtime Reporter

8

9

10                                        

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25